G. B. HADDOCK, Appellant, v. GENEVIEVE S. JACOBS et al., Appellees.

WILLS:· Testamentary Capacity—Unsound Mind—Sufficiency of Evidence. Evidence reviewed, and held sufficient to submit to the jury the question of testator's capacity to make a will.

EVIDENCE: Opinion Evidence—Testamentary Capacity—Discretion of Court. Testimony to the effect that the decedent was very nervous, physically weak, and was slow in answering questions,

and that decedent had said to the witness that she (decedent) did not know what she wanted to do with her property, is sufficient upon which to base an opinion that the testator was of unsound mind, the principle being recognized that the trial court has some discretion in admitting such testimony.

EVIDENCE: Opinion Evidence—Hypothetical Question—Assumption of Facts. Evidence in a will contest reviewed, and held to prove matters upon which hypothetical questions were based, the question whether such facts had been established being for the jury.

*Appeal from Taylor District Court.*—H. K. EVANS, Judge.

APRIL 11, 1919.

THIS is a will contest. The objections to the probate of the will were that deceased was of unsound mind, and that the will was executed as the result of undue influence. The case was tried to a jury, which found a general verdict for the contestants, and answered two special interrogatories, one of which answers was that undue influence was not exercised, and the other, that deceased was of such unsound mind as to be incapable of making a valid will. Judgment was entered, refusing probate. The proponents appeal.— *Affirmed.*

*Haddock & Son,* for appellant.

*Flick & Flick,* for appellees.

PRESTON, J.—1. The estate of deceased amounted to from $2,500 to $3,000. Deceased had had some misunderstanding with her sister Genevieve Jacobs, one of the contestants, over the will of a deceased sister; but the jury could have found from the evidence that there had been a complete reconciliation, and that nothing had occurred to disturb the friendly relations with her mute brother, or two nieces, daughters of a deceased sister, and contestants, or with another niece of her husband's, of whom deceased

seemed to have been very fond. It was the expressed desire
of deceased that the last-named niece should have a collection
of solid silver pieces, which deceased and her daughter had
collected, each piece of which was engraved with the Kersey
name. The two principal beneficiaries in the will were neigh-
bors of deceased's, who had been kind to her. The provisions
of the will, stated as briefly as may be, are that, after the
payment of debts and funeral expenses, she gives $100 to
the Cemetery Association, to be invested, and the interest
applied in keeping up the Kersey lot, and provides for a
monument, to cost about $500; that her books be given to
the Benefit Library Association, such donation to be known
as the Isaac and Margaret Kersey Donation; that the
dresser and bedstead in a certain room be given to Mrs.
Josephine Ray; and that all the rest and residue of the
property be sold, and the proceeds be divided between Mrs.
Josephine Ray and Mrs. Ella Keith, G. B. Haddock to act
as executor. It was signed by her mark, Sunday, January
28, 1917. She died a few hours after the will was executed.
She was 81 years of age. She had sustained a fractured
femur, about 12 weeks prior to her death, during which time
she suffered intense pain, according to some of the testi-
mony, and took opiates to alleviate the pain; and contes-
tants' evidence tended to show that she had hallucinations.
Proponents placed two witnesses on the stand, in the first
instance, who testified to the execution of the will and to
what was said and done at that time, and that she was of
sound mind. At the close of contestants' evidence, propo-
nent moved for a directed verdict, which was overruled.
Thereupon, proponents put in their rebutting evidence, with-
out renewing the motion for a verdict.

There are but two or three errors and points relied upon
for reversal. The main proposition is as to whether the
evidence was sufficient to take the case to the jury, and to

sustain the verdict. We shall set out the substance of the testimony, as briefly as we can, offered on behalf of contestants, and enough to show that, even though it was contradicted by witnesses for proponents, there was a case for the jury. It may be conceded that it is a border line case on the facts. We are not, however, the triers of the facts. Had the verdict been the other way, we would not be justified in interfering. A witness testifies that she became acquainted with deceased about the middle of November, 1916, and did the housework, and took care of deceased. Deceased was then in bed, with a broken hip. She staid until January 13th. She says that, the last three weeks she was there, deceased seemed to see different things, in different places; claimed there was something there, and that witness had to take it off of the mind of deceased. Other times, she would see things on the wall. The 18th of January, 1916, she said, was on the mirror in front of her, but witness could not see anything. There was a vase of flowers which witness moved, and deceased said they were still there, after all. Another time, she thought she saw Dr. Sollis, on the motorcycle, sitting outside the house, and that he had his hands over his head; but the doctor was not there. Deceased insisted that he was. Deceased suffered quite a good deal of pain with her limb while witness was there. Witness says that Josephine Ray was over at the home of deceased almost every day; that she had some conversation with Mrs. Ray about deceased's making a will. Nora Thompson testified that she lived across the street from deceased, and visited her frequently,—nearly every day; was present when the will was drawn, sitting not far from the folding door in the next room; could distinctly hear what was said, and was watching the proceedings; that—

1. WILLS: testamentary capacity: unsound mind: sufficiency of evidence.

"Mr. Haddock would ask Mrs. Kersey questions, and it took her some time to answer them, and then he suggested some things to her, and he says, 'Now I want you to just tell your own opinion,—I merely suggest these things to you;' and she would say, 'Uh huh.' Some things she would tell in her own way, what she wanted, but it took quite a while. She wanted all her books left to the public library, and then she wanted some expenses set aside to the Cemetery Association, and for a monument. She did not say anything about the bedroom furniture, what she wanted to do with that. I heard that read in the will."

When asked to tell how that came to be in the will, she says:

"Well, Mrs. Ray had it written down on a slip of paper, and she handed it to Mr. Haddock, and he read it. On the slip of paper was, 'I give Mrs. Josephine Ray the bed and dresser and its contents.' Before this was said, Mr. Haddock asked Mrs. Kersey if she had any relatives or friends that she would like to have her property go to. She hesitated for a while, and then she said, 'Mrs. Ray and Mrs. Keith have been good to me.' Then, at that time, Mrs. Ray handed Mrs. Kersey the slip of paper. Well, that was all that was said. They just jumped to the conclusion she wanted it left to those two ladies. I think that, if she had been given time, she would have said other people were good to her. Mrs. Kersey did not say she wanted to leave it to these two ladies. She said they had been good to her. As to the balance of the property, the home and that sort of thing, Mr. Haddock asked her what she wanted to do with these. She said, 'I don't know.' Mr. Haddock says, 'Mrs. Kersey, you will have to sign this. If you are unable to write your name, just make your cross.' He said, 'There will have to be two witnesses;' and he turned to Dr. Sollis and said, 'You will be one,' and he said Miss Iva Larison would be the other. I did not hear Mrs. Kersey say any-

thing to that. Q. State how she appeared. Tell the jury what she looked like, and that sort of thing. A. She was just lying there, and seemed to be very nervous, physically weak. Q. Now, basing your opinion on what you saw, or what you have detailed to the jury, what would you say, whether or not Mrs. Kersey was of sound or unsound mind at the time this will was executed? (Mr. Haddock: Objected to because there are not sufficient facts testified to to base an opinion on. The Court: Witness may answer. Proponent excepts.) A. Well, I think she was of unsound mind."

Error is predicated upon the ruling of the court just stated, and this will be referred to later.

Another witness testifies that she was at the home of deceased, one evening after deceased had been hurt, at which time deceased contended that there was a black cat on the foot of her bed.

"I thought that was queer, and said, 'What is the matter?' Mrs. Keith was there, and she says, 'Oh, she has been that way frequently since she was hurt.' There was no black cat there. She thought there was a coat or something else on her bed, and there was nothing there at all."

Dr. Paschal was the family physician for deceased and her family for years, but was himself sick at the time of her last sickness; was well acquainted with her. He testifies that the tendency of the mind is to weaken, along with the body; that the tendency of administering opiates and anodynes to patients of that age is always to affect the mental condition, if continued for any length of time. It is weakened. In answer to a hypothetical question, he gave his opinion that she was weak-minded, and that, knowing her as he did, all his life before that, she wouldn't be of a competent mind,—wasn't at that time,—from the effect partly of the suffering and pain, and perhaps as much from the drugs. Other witnesses testify to her appearance and

physical condition, and there may be some circumstances in cross-examination of proponent's witnesses tending to support contestants' theory, and circumstances in cross-examination of contestants' witnesses tending to show mental capacity. There is some impeaching testimony as to proponent's witnesses, more particularly, perhaps, as to Dr. Sollis, tending to show that he said to several others that deceased was not in a fit condition to make a will at the time it was made, or during that day. There was other such evidence as to her being in a stupor, for some hours before the will was made. Witnesses were called for proponents in rebuttal, some of whom testify that, in their opinion, deceased was of sound mind. We shall not take the space to set out proponent's evidence. It is enough to say that it is in conflict with the contestants' testimony. Appellees so concede. After an examination of the entire record, we think the evidence is sufficient, and that it was for the jury to say whether deceased possessed testamentary capacity, and understood, in a general way, the nature of the instrument she was executing, the natural objects of her bounty, the nature and extent of her property, and the manner in which she wished to dispose of her estate.

2. Taking up now the ruling of the trial court on the objection of proponents to the testimony of Nora Thompson, heretofore set out. There is no argument for appellee on this point. We think the question was not objectionable. True, a witness testifying to unsoundness should detail the facts upon which opinion is based. It is evident that counsel started his question on the thought that witness could give her opinion on what she saw, then corrected himself and the question, by asking her to base her opinion on what she had detailed; or the word "or" can be, as is often done, considered as synonymous with "and." Appellant seems to have so construed the question, for the

2. EVIDENCE: opinion evidence: testamentary capacity: discretion of court.

objection made was not on the specific ground now urged. We shall not repeat the testimony of this witness, as we have heretofore set it out somewhat in detail. Some of it indicates conditions of deceased that are out of the ordinary, and tend to indicate unsoundness of mind; that deceased was very nervous, physically weak; said she did not know what she wanted to do with her other property; that she was slow in answering, and so on. There were sufficient facts testified to upon which to base an opinion. There is some discretion in the trial court as to such matters. There was no error as to this.

3. Complaint is made of the hypothetical question propounded to Dr. Paschal. The complaint is that it contains statements as facts not proven to be such. Cases are cited, holding that such a question should be based

3. EVIDENCE: opin-
ion evidence:
hypothetical
question:
assumption of
facts.

on facts which the evidence proves, or tends to prove. The question is too long to set out in the opinion. We think there is evidence tending fairly to prove all the facts assumed. Whether they had been established, was for the jury. We reach the conclusion that there is no prejudicial error, and the judgment is, therefore,—*Affirmed.*

LADD, C. J., EVANS and SALINGER, JJ., concur.